UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

TREVIS LOVE,                        )
              Petitioner,          )
                                )
v.                                  )        NO. 2:03-CR-62
                                )        NO: 2:09-CV-18
UNITED STATES OF AMERICA,           )        Judge Greer
              Respondent.          )

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter is before the Court on petitioner Trevis Love's ("Petitioner" or "Love") motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, [Doc. 816], the government's response, [Doc. 834], and petitioner's answer to the government's response, [Doc. 845].[1]  Based upon its review of the petition, the government's response, Love's reply, and the record of the prior proceedings, the Court has previously determined that an evidentiary hearing will be conducted as to three claims raised by petitioner related to his claims of ineffective assistance of counsel for failure to seek to sever petitioner's case from that of co-defendant Delman Davis, failure to interview and present certain witness testimony, and failure to secure and present testimony of a handwriting analyst, [Doc. 881].  That evidentiary hearing is scheduled for March 9, 2012.

As to all other claims made in the petition, however, the Court has concluded that the files and records in the case conclusively establish that the petitioner is not entitled to relief under § 2255 and the motion will be denied as to those claims.  This memorandum opinion and order will,

---

[1]  The petitioner has also filed a supplemental petition pursuant to § 2255, [Doc. 877], and the government has responded to that supplement, [Doc. 880].  This order does not address that supplement since petitioner has been granted an extension of time until February 23, 2012, to reply to the government's response.  The Court will address that supplemental petition once Love's reply has been filed.

therefore, dispose of all claims raised by Love in his petition except for the ones on which an evidentiary hearing has been granted.

## I. Procedural And Factual Background

Eric Serna and Delman Davis were indicted by the federal grand jury on August 26, 2003, [Doc.13]. On October 28, 2003, the grand jury returned a superseding indictment charging Love, Serna, Davis, and five co-defendants with conspiracy to possess and possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1), [Doc. 64]. Love was arraigned on November 21, 2003, and was represented through the trial of the case by retained counsel.[2]

After extensive litigation of pretrial motions, the case of petitioner and co-defendant Davis was tried before a jury. After six days of trial, Love was convicted of the conspiracy charge on November 3, 2004, [Doc. 544]. A Presentence Investigation Report ("PSR") was ordered. The PSR was disclosed to the parties on January 26, 2005. The probation office calculated Love's guidelines range at 168 to 210 months imprisonment; however, Love, because of a prior felony drug conviction, was subject to a 240 mandatory minimum term of imprisonment.[3] Thus, his guideline range was 240 months. A sentencing hearing was conducted on June 7, 2005, and Love was sentenced to the minimum mandatory of 240 months. Judgment was entered on June 30, 2005, [Doc. 700]. The judgment was appealed to the Sixth Circuit Court of Appeals, [Doc. 701]. The Sixth Circuit

---

[2] Love's retained counsel were permitted to withdraw after trial and a CJA attorney was appointed to represent Love at sentencing. Appointed counsel also represented Love during his direct appeal.

[3] On April 7, 2004, the United States filed a notice pursuant to 21 U.S.C. § 851 of intent to seek enhanced punishment based on Love's prior conviction on January 24, 1994, in the Greene County, Tennessee Criminal Court of possession of more than one-half gram of crack cocaine with intent to sell or deliver and sale of more than one-half gram of crack cocaine.

affirmed on November 14, 2007. *United States v. Love*, 254 Fed. App'x 511, 2007 WL 3391169 (6th Cir. 2007). The instant § 2255 motion was then timely filed.

The following statement of the facts and procedural background is taken from the government's response:

> . . .cooperating co-defendant Gorge Duarte testified in the government's case in chief that he was responsible for distributing 163 kilograms of cocaine during the course of the conspiracy, which existed from 1998 to 2003. (R. 607, Trial Transcript, Gorge Duarte, TR 34-35.) Duarte obtained ten to fifteen kilograms of cocaine every couple of weeks from California, Chicago, and Georgia, which he then distributed in the Newport, Morristown, and Johnson City communities of Tennessee. (*Id*. at 37- 38.) Duarte estimated that he provided forty to fifty kilograms of cocaine to petitioner from 2002 to 2003. (R. 609, Trial Transcript, Duarte, TR 23.),
>
> Duarte described how in 2002 co-defendant Cole Butler introduced Duarte to petitioner and co-defendant Delman Davis at a Kentucky Fried Chicken restaurant in Johnson City for the purpose of Duarte possibly investing in a music concert being organized by petitioner. (R. 608, Trial Transcript, Duarte, TR 52-53.) Later, Davis called Duarte and Duarte met with petitioner and Davis at the same restaurant and discussed Duarte fronting cocaine to petitioner and Davis. (*Id.* at 53-54.)
>
> On the first occasion, Duarte fronted a kilogram of cocaine for $24,000 to Davis. (*Id.* at 54.) Four days later, Duarte fronted petitioner and Davis each a kilogram of cocaine. Petitioner and Davis paid Duarte for the fronted cocaine within a week. (*Id.* at 55.) Thereafter, Duarte confronted petitioner and Davis each a kilogram of cocaine a week, or two kilograms every two weeks, for seven or eight months until Duarte was imprisoned on state charges in 2003. (*Id.* at 55-56.)
>
> Petitioner always paid Duarte for the cocaine that petitioner was fronted, and on occasion Davis would owe Duarte money. (*Id.* at 56.) Duarte described how either petitioner or Davis would call Duarte, Duarte would send his cousin, Eric Serna, to deliver the cocaine to petitioner and Davis, and then Duarte would personally pick up the cash after petitioner and Davis sold the cocaine. (*Id.* at 57.) Duarte and/or Serna usually met with petitioner and/or Davis

either at a location on Poncho Road, or at Davis's car-detailing business in Johnson City, or at a house in Johnson City that was located next to a church. (*Id*. at 41, 56-61, 74-76.)

Duarte recorded in notebooks, some of which were admitted into evidence, the amount of cash that he was owed by various persons to whom he was fronting cocaine, as well as how much he owed his suppliers. (*Id*. at 40.) Duarte kept a list of customers' names and their telephone numbers that he used to contact his customers. (*Id*. at 41.) When a customer made a payment, Duarte subtracted the amount paid from the amount owed, keeping a running tally of the drugs he had fronted. (*Id*. at 44.)

Duarte identified petitioner in the courtroom and then located in one of his notebooks an entry where he had inscribed petitioner's name and a notation indicating that petitioner had been fronted three kilograms of cocaine and owed Duarte $72,000, or $24,000 per kilogram. (*Id.* at 45-46, 48-49.) The ledger showed that petitioner made a payment, leaving a balance owed of $40,500. (*Id.* at 50.) Duarte identified a list of drug customers' names and telephone numbers and pointed out the entry for petitioner with petitioner's telephone number. (*Id*. at 50, 52.)

In another similar notebook, Duarte identified an entry for cash that petitioner owed him for fronted cocaine, and also identified a loan in 2002 for $14,000 that Duarte made to petitioner so that petitioner could purchase a Cadillac Escalade. (*Id*. at 65-67.) In another similar notebook's entry, also admitted as a trial exhibit, Duarte testified that an entry demonstrated that petitioner owed $72,000 for cocaine, had paid $14,000, and still owed $58,000. (*Id*. at 74.)

When Duarte was incarcerated in 2003, Duarte gave his notebooks containing the notations regarding his drug business to his cousin, Eric Serna, whom Duarte described as "my right-hand man," and Serna stored the notebooks in a safe at Serna's residence. (*Id*. at 42.)

In 2002, Duarte purchased a Cadillac Escalade from petitioner for $42,000 cash that later was forfeited to the United States. (*Id*. at 77-78.) Duarte would drive the Escalade to co-defendant Davis's shop to have it "detailed" and often would see petitioner there and conduct drug transactions. (*Id*. at 80-81.) Also in 2002, Duarte purchased a Lincoln Navigator from petitioner in exchange for a

kilogram of cocaine. When petitioner filled out the transfer documents, petitioner indicated that petitioner gave the car to Duarte as a gift. (R. 609, Trial Transcript, Duarte, TR 19-22.)

At the conclusion of Gorge Duarte's direct testimony on the second day of trial, the United States sought to introduce evidence that petitioner was purchasing and selling crack cocaine in addition to powder cocaine as charged in the indictment. The Court heard the parties the beginning of the third day outside the presence of the jury. (R. 609, Trial Transcript, TR 2-5.) The United States proffered that Duarte would testify that in 2002 Duarte sold petitioner at petitioner's request two kilograms of crack cocaine, and also that on some occasions when Duarte was selling petitioner powder cocaine, petitioner asked Duarte to convert it to crack cocaine for him. (*Id*.) The United States also proffered the testimony of Kelvin Jackson, who purchased crack cocaine from petitioner in November and December 2002, and Vernon McCallum, who sold crack cocaine to petitioner in 1998 and 1999. (*Id*.)

Following argument of the parties, the Court found that the proposed testimony constituted "other acts" of uncharged conduct that was not part of the charged conspiracy but instead was part of a separate conspiracy, thus it was not admissible as res gestae evidence. (*Id*., TR 14-15.) As for its admissibility under Rule 404(b), the Court found that the evidence of crack cocaine transactions by petitioner was not admissible as part of the plan or in preparation of the charged conspiracy. (*Id*. at 15-16.)

The Court concluded, however, that the evidence was relevant to demonstrate petitioner's intent to participate in the charged conspiracy. (*Id*. at 16.) Nevertheless, weighing the probative value of the evidence against its unfair prejudice, the Court first found that, on the issues before the jury, the evidence that petitioner purchased crack from Duarte on one occasion was cumulative of Duarte's testimony that he was selling powder cocaine to petitioner once or twice a week for seven or eight months, which reduced its probative value. There was ample evidence in the record to establish petitioner's specific intent to participate in the cocaine conspiracy. (*Id*.)

Moreover, the Court found that the potential prejudicial effect of the evidence of petitioner's crack cocaine transactions would be great. Even with a cautionary instruction, the Court was concerned that the jury would simply conclude that petitioner was a drug dealer

and, on that basis alone, convict him of participating in the charged conspiracy. The Court thus found that evidence of the uncharged conduct of petitioner's crack cocaine transactions with Duarte and others was not admissible. (*Id.* at 16-17.)

After Duarte, as to petitioner, the United States presented the testimony of Eric Serna. Serna had been arrested in August 2003 and charged in this case and subsequently pled guilty pursuant to a cooperation plea agreement to conspiracy to distribute a half kilogram of cocaine. Serna admitted that he had been working for his cousin, Gorge Duarte, since April 2002 delivering cocaine and picking up money. (*Id.*, Eric Serna, TR 217-19.) In return, Duarte paid Serna $500 a week, which increased to $1,000 a week "towards the end." (*Id.* at 219.) Serna usually delivered the cocaine to a location on Poncho Road in Greeneville. (*Id.* at 219-20.)

In late May or early June 2002, Serna accompanied Duarte to Davis's business in Johnson City to pick up money from the sale of a kilogram of cocaine. (*Id.* at 222.) Thereafter Serna made several trips to the business to pick up money for fronted cocaine. (*Id.*) Serna also recalled a house in Greeneville where he would meet petitioner to pick up money from petitioner for cocaine that Duarte fronted to him. (*Id.* at 223-24.) Serna described how petitioner would call Duarte and ask for "either a kilogram or two," Duarte would instruct Serna to deliver the cocaine to petitioner, and "most of the time" Serna would deliver the cocaine to the Poncho Road location. (*Id.* at 224.) Petitioner had two persons who would pick up cocaine for petitioner, "Eric" and a man nicknamed "Biz." (*Id.* at 224-25.)

Serna also described the entry of drug debts into the notebooks, stating they would log "$24,000" for a kilogram of cocaine and then deduct payments as they were received. (*Id.* at 225-26.) Serna reviewed one of the notebooks, Exhibit 6, and identified entries Duarte had made showing three kilograms of cocaine had been fronted to petitioner for $72,000. (*Id.*) He said it took petitioner anywhere from a week to two weeks to pay for three kilograms of cocaine. (*Id.* at 226.) Another entry indicated petitioner had been fronted two kilograms of cocaine for $48,000. (*Id.* at 227.)

When Duarte was arrested, he gave the notebooks to Serna and instructed him to lock them in a safe in Serna's house. (*Id.* at 228.) The notebooks were discovered during a search of Serna's house by federal agents following Serna's arrest. (*Id.* at 229.)
Serna would visit Duarte's customers every three days or so

to see how much money they had from the sale of the fronted cocaine and, if payments were not being made, Duarte would start calling the customers every day. (*Id*. at 226-27.) Duarte would get ten to fifteen kilograms of cocaine every other week and Serna delivered cocaine to five or six different customers for Duarte. Petitioner was getting one or two kilograms a week. (*Id*. at 233.)

Serna confirmed that Duarte purchased a Cadillac Escalade from petitioner in March 2003, and that Duarte bought a Lincoln Navigator from petitioner in exchange for a kilogram of cocaine, which Serna delivered to petitioner. (*Id*. at 237-38.) Petitioner later gave Serna the title and other paperwork for the transfer of the Navigator, which petitioner had completed to indicate the vehicle was a gift from petitioner's mother to Serna's wife. (*Id.* at 238-39.)

Serna confirmed that when Duarte was arrested in March 2003, Serna took over his drug business and was in charge of getting cocaine from Duarte's suppliers to his customers. (*Id*. at 219.) After Serna took over, he delivered a total of twelve kilograms of cocaine. (*Id.* at 221.) Serna fronted three of those kilograms to petitioner. (R. 610, Trial Transcript, Serna, TR 4.)

On August 21, 2003, Serna met with petitioner in the middle of the afternoon at the mall and they agreed that petitioner would give Serna a Honda Accord and that Serna would deduct the cost from petitioner's drug debt for cocaine that Serna had fronted petitioner. (R. 609, Trial Transcript, Serna, TR 242-44.) Serna and petitioner also discussed an $18,000 drug debt that was owed to Serna by Jeremiah Lovelady, who was a customer of Serna's and a personal friend of co-defendant Davis. (*Id*. at 244-45.) Serna stated that he had heard that Lovelady was working undercover for the police and petitioner called Davis, discussed the matter with him, and Davis came to the mall to talk with Serna and petitioner. (*Id*.) Davis and Serna agreed that Davis would attempt to collect Serna's $18,000 debt from Lovelady and, in return, Davis could keep $5,000. (*Id*. at 245.) They left the mall and, in less than an hour, Davis called Serna and said he had spoken with Lovelady and that Lovelady had the money. Serna instructed Davis to pick up the money from Lovelady and take it to Davis's residence where Serna would pick it up. (R. 610, Trial Transcript, Serna, TR 2-3.) Later that day, Serna was arrested at Serna's home. (*Id.* at 5; R. 609, Trial Transcript, Serna, TR 242.)

Raven Serna, Eric Serna's wife, testified that at Gorge

Duarte's request, she allowed a Lincoln Navigator to be titled in her name. She was shown Exhibit 1 and identified it as the title originally issued to petitioner's mother, Madie Love. The paperwork identified the vehicle as a gift from Madie Love to Raven Serna, a person Raven Serna did not know. (R. 610, Trial Transcript, Raven Serna, TR 162-65.)

DEA Agent Michael Templeton testified that on August 12, 2003, Jeremiah Lovelady was a cooperating informant and purchased a half kilogram of cocaine from Serna's cousin, co-defendant Guadalupe Duarte. (*Id.*, Michael Templeton, TR 190-91.) Lovelady had informed Templeton that Lovelady had an outstanding $18,000 drug debt for cocaine that had been fronted to him by Guadalupe Duarte. (*Id.* at 191.) While working with Templeton, Lovelady collected the money from his customers to whom he had distributed the cocaine fronted by Guadalupe Duarte, and arranged through recorded telephone calls to meet with Guadalupe Duarte to pay him and receive more cocaine. (*Id.* at 191-92.)

On August 12, 2003, Templeton and other agents positioned themselves at the rural location where Lovelady was to meet Guadalupe Duarte. (*Id.* at 192.) In a videotaped meeting, Lovelady sat in his vehicle, Guadalupe Duarte drove up in his vehicle with the window rolled down, Duarte threw a box through the window of Lovelady's car, Lovelady handed Duarte a box containing $16,000 in cash, and Duarte immediately left. (*Id.* at 196.) The box Duarte gave Lovelady was a cellular phone box that contained a half a kilogram of cocaine worth $12,000. (*Id.* at 195-96.) As a result, Lovelady now owed Guadalupe Duarte a total of $18,000 for cocaine Duarte had fronted him. (*Id.* at 196.)

On August 21, 2003, Lovelady called Templeton and advised that Eric Serna had called Lovelady to collect $18,000 that he said that Lovelady owed Serna. (*Id.* at 197.) Templeton met with Lovelady and was informed that Serna was sending co-defendant Davis to collect the money from Lovelady. (*Id.* at 198.) The meeting was to be at Applebee's restaurant in Greeneville. (*Id.*)

At 7:30 p.m., Agent Templeton and three other agents went to the Applebee's restaurant where they observed co-defendant Davis arrive in a rented pick up truck, enter the restaurant, and walk around the restaurant talking into his cell phone, saying "I'm here, where are you?" (*Id.* at 199.) Templeton identified himself, advised Davis that he was under arrest, and escorted him outside. (*Id.*)

Davis admitted to Templeton that he had met with Eric Serna earlier that day and that Serna had instructed Davis to meet with Lovelady to collect the drug debt. (*Id*. at 200-01.) Agents went to Serna's house and placed him under arrest and searched his house, seizing, among other items, Gorge Duarte's drug ledgers. (*Id*. at 203-04.)

On cross-examination, Agent Templeton explained that when he testified before the grand jury he stated that the word "Love," petitioner's last name, appeared in Gorge Duarte's drug ledgers, but he should have said that "Travis," similar to petitioner's first name "Trevis," was used by Duarte in the drug ledgers to refer to petitioner. (*Id*. at 245-46.) Templeton did not have the ledgers with him when he testified before the grand jurors. (*Id*. at 246.) Templeton explained further that petitioner's tax records were not subpoenaed from the IRS, but that the United States had subpoenaed records from the State of Tennessee regarding petitioner's business revenue from his promotional business, which came back negative. Templeton believed this was because petitioner's business was located in Bristol, Virginia and was registered in that state. (*Id*. at 246-47.)

After Templeton completed his testimony, and immediately prior to the United States' resting its case, the parties presented a stipulation regarding petitioner's prior felony drug conviction and a stipulation regarding prior convictions of co-defendant Davis. (*Id.*, TR 254.) The Court admitted the stipulations and gave the jurors a limiting instruction that they could consider this evidence only as to whether either defendant had the requisite intent to participate in the conspiracy charged in the indictment. (*Id*., TR 254-55.)

Thereafter, the United States rested. (*Id*. at 255.) Petitioners moved for judgment of acquittal, which motion was taken under advisement and later denied by the Court. (*Id*. at 255, 281-82.)

Petitioner presented the testimony of Natalia Stewart, who was a friend of Gorge Duarte's wife and who testified, contrary to Duarte's testimony that he could not write in Spanish, that she had seen Duarte write in a language she assumed was Spanish because at the time he was speaking Spanish with Hispanic acquaintances. (*Id*., Trial Transcript, Natalia Stewart, TR 259-60, 273-74.) Stewart also testified that while Gorge Duarte was in jail she was at his residence and heard a conversation between Duarte and his wife, who was using the speaker function on the telephone. In that conversation, Duarte stated he had been asked by the United States to testify

against co-defendant Gary Musick, but that Duarte did not have drug dealings with Musick. (*Id.* at 261-63.)

On cross-examination, Stewart agreed that her cousin, Craig Stewart, had been charged and pleaded guilty in this case, but denied that she knew that Duarte also was going to testify against Stewart's cousin if he went to trial. (*Id.* at 274-75.)

Elvin Brown testified on petitioner's behalf that he knew petitioner and that he was called by Agent Templeton and asked if he was involved in drug dealing with petitioner. (R. 611, Trial Transcript, Elvin Brown, TR 3-4 .) Brown advised Templeton that he was not involved in drug dealing. (*Id.* at 4.)

Javon Bowen testified on petitioner's behalf that he was the owner of the house where, according to earlier testimony, cocaine was delivered to petitioner on multiple occasions. (*Id.*, Javon Bowen, TR 6.) Bowen stated that no one else had a key to Bowen's house and he denied that cocaine was regularly delivered there. (*Id.*) When asked if he knew Gorge Duarte, Bowen testified that he had "met him one time," and stated that the only time Bowen recalled that Duarte had been to Bowen's residence was the occasion when Duarte picked up the truck that he had purchased from petitioner. (*Id.* at 7-8.) Bowen did not know Eric Serna, did know Delman Davis, and denied that Duarte, Serna, and Davis regularly met at Bowen's residence. (*Id.* at 7.)

On cross-examination, Bowen stated that he was present when Duarte came to purchase petitioner's truck but he was in his room and was not present and that he later saw the cash that Duarte paid on the kitchen table, but did not know how much he paid because it was "none of my business." (*Id.* at 9-10.) Bowen confirmed that if Bowen was not present, petitioner could not enter Bowen's residence. (*Id.* at 11.)

Petitioner took the stand and testified in his own defense. Petitioner admitted that at the age of eighteen, the summer following his first year of college, petitioner had been in a car with an "older gentleman" and ""rode with him while he was doing a drug transaction." (*Id.*, Trevis Love, TR 15-16.) The older man handed petitioner a "little baggy of cocaine" and petitioner handed the baggy to an undercover agent with the Tennessee Bureau of Investigation. Petitioner was charged with sale of more than .5 grams of cocaine. (*Id.*) Petitioner pleaded guilty because he knew what he was doing,

had been sentenced to eight years, had served nine months, and then had gone to boot camp. (*Id.*) That case was now over. (*Id.* at 17.)

Petitioner described his educational background, which included petitioner's near-completion of his college degree, and his present full-time employment as a senior account executive with Suncom AT&T Wireless cellular provider. (*Id.* at 15, 17-19.) Petitioner received a salary and commissions biweekly; his average paycheck was $4,631, with the highest being $7,000. Petitioner had earnings of $43,982.28 for that year up to October 15, 2004. (*Id.* at 19-21.)

Petitioner also described a business he had started with two partners that presented entertainers and speakers at East Tennessee State University using promotional sponsors. (*Id.* at 22-27.) Petitioner's third employment was his involvement in a profitable business with his father and uncle in North Carolina. Petitioner was the chief executive officer and financed the purchase of commercial dump trucks that were used in construction projects to haul dirt, sand, gravel, and, during the winter, snow. (*Id.* at 28.)

As for petitioner's relationships with his co-defendants in this case, petitioner testified that he met Gorge Duarte in late 2002 at co-defendant Davis's shop. Duarte, overhearing petitioner discussing his concert promotion business with Davis, asked petitioner about providing information to Duarte about applying for business loans and even inquired about classes for small business owners at East Tennessee State University. (*Id.* at 29-30.)

Later, petitioner heard that Duarte wanted to invest some money in one of petitioner's promotional events and they met for lunch at a Kentucky Fried Chicken restaurant to discuss the matter. (*Id.* at 30-31.) Petitioner gave Duarte an informational brochure regarding an upcoming 9/11 tribute that petitioner was presenting at the University, an event in which Duarte said he was interested in investing. (*Id.* at 31-32.)

After another meeting at the Kentucky Fried Chicken restaurant, Duarte decided to invest in the event and initially paid petitioner $15,000 in cash, then two days later Duarte brought petitioner another $15,000 in cash, and then Duarte gave petitioner another $15,000 in cash the following day. (*Id.* at 33-35.) All three of these meetings were at Javon Bowen's residence with Bowen and others present. (*Id.* at 35.)

Petitioner took Duarte's $45,000 cash and placed it in a lockbox at petitioner's residence. At the time, petitioner was negotiating with the financial advisor of his cousin, Leonard Little, who plays for the St. Louis Rams, about Little becoming a full-time partner in the promotional business. (*Id*. at 35-36.) When Little decided to become a partner and invest $100,000, petitioner returned Duarte's $45,000 cash to Duarte. (*Id*. at 36-37.) Duarte understood that petitioner preferred a full-time partner like Little who did not expect an immediate return on his investment. (*Id*. at 37.)

Petitioner and Duarte met again in October 2002 when Duarte purchased petitioner's Lincoln Navigator, which was titled in petitioner's mother's name. (*Id*. at 38-40.) Duarte paid petitioner $25,000 in cash at a meeting at Javon Bowen's house. (*Id*. at 40.) Petitioner testified the transfer section of the title was blank when he gave the title to Duarte and stated he did not even remove the title from the envelope when he received it, but simply gave Duarte the entire envelope. (*Id*. at 42-43.)

Petitioner explained that his meetings with Duarte were at Bowen's house because "we often stayed at Mr. Bowen's house practicing for the event." (*Id*. at 41.) Bowen had studio equipment that petitioner and others used to prepare music, thus he and others often met there. (*Id*.) Petitioner denied that he exchanged the Navigator for a kilogram of cocaine. (*Id*. at 44.) Petitioner testified that he used the cash paid by Duarte for the Navigator to finance a Cadillac Escalade that petitioner purchased in Atlanta. (*Id*. at 45-47.)

Gorge Duarte purchased another vehicle from petitioner, a Cadillac Escalade, that was owned by Leonard Little. (*Id*. at 54-55.) The car was in St. Louis at the time and Duarte purchased it "sight unseen" because petitioner described it to Duarte, and it was the same as the Escalade petitioner owned, just a different color. Duarte paid petitioner $35,000 in cash and again picked up the Escalade at Jevon Bowen's house. (*Id.* at 54-57.) That was the last time that petitioner saw Duarte before the trial. (*Id.* at 58.) Petitioner denied that he engaged in cocaine transactions with Gorge Duarte. (*Id.*)

Petitioner stated that he knew Eric Serna, having met him through Serna's cousin, Gorge Duarte, when Duarte would get his car cleaned at co-defendant Davis's shop. (*Id*. at 59.) Petitioner tried to sell Serna cell phones. (*Id.*) Serna was with Duarte when they met at Kentucky Fried Chicken to discuss Duarte's possible investment in petitioner's promotional company. (*Id.*) Serna became angry with

petitioner when petitioner would not let Serna test-drive petitioner's Mazda Millennium, which Serna wanted to purchase. (*Id*.)

Petitioner sold Serna two Honda Accords for $4,500 cash, which Serna gave petitioner when he picked the cars up on July 4, 2003, at petitioner's residence. (*Id*. at 60-62.) Petitioner had misplaced the title to one of the Accords and Serna called petitioner every day regarding the title since Serna was planning to sell it to someone else and needed the title. (*Id*. at 62.)

On August 20, 2003, petitioner called Serna and told him petitioner had the title and Serna agreed he would pick up the title. (*Id*. at 62-63.) Serna met petitioner at the mall to pick up the title for the Honda Accord and, during their conversation, Serna mentioned Jeremiah Lovelady from whom Serna had purchased a Camaro for $16,500. (*Id*. at 64.) Serna stated he needed to get in touch with Lovelady because the "salvage" title Lovelady had given Serna was not acceptable in Tennessee. Petitioner stated that he knew Lovelady, who was a cell phone customer, but that petitioner could not help Serna. (*Id*. at 64-65.) Petitioner was expecting to be joined by co-defendant Davis, who was petitioner's friend, and petitioner told Serna to ask Davis about how to get in touch with Lovelady. (*Id*. at 65.) Petitioner denied that Serna said anything about Lovelady cooperating with law enforcement agents or anything regarding cocaine. (*Id*.)

Serna and petitioner then went to petitioner's house so that Serna could look at a "collector car" that petitioner owned that at the time was parked in a neighbor's driveway. (*Id*. at 66.) Petitioner and Serna could not agree on a price, Serna left, and petitioner went back to work. (*Id.* at 66-67.)

Petitioner left work early and went to co-defendant Davis's house where Serna and Davis were outside looking at a red truck, and Serna was still asking about getting in touch with Lovelady to get the car title Serna needed. (*Id.* at 67.) Petitioner left after about an hour to go coach a semi-pro football team in Johnson City and did not see Serna again. (*Id*. at 68.)

Petitioner denied purchasing cocaine at any time from Serna. (*Id*. at 69.) Petitioner denied that he was the "Travis" listed in Duarte's notebooks as a customer. (*Id*. at 76-77.)

During cross-examination, petitioner was shown a page from

Gorge Duarte's ledger and admitted that the telephone number noted in the ledger next to the name "Travis" was petitioner's cellular telephone number. (*Id*. at 78-79.) Petitioner was asked to compare his signatures on defense exhibits with the signature on the title to the Navigator, which he denied signing, and petitioner denied that the signatures were distinctive and similar. (*Id*. at 89-91.)

Following petitioner's testimony, petitioner rested his case. (*Id*. at 108.) In rebuttal, the United States presented the testimony of Sherron Lane, petitioner's supervisor at Suncom AT&T Wireless. (*Id*., Sherron Lane, TR 109, 112-13.) She stated that petitioner was an account executive, but that he had not been promoted to a senior account executive. (*Id*. at 113-14.) Petitioner previously had been meeting his quotas, but had not done so since May 2004. (*Id*. at 115.)

Petitioner had stated on cross-examination that he handled the cell phone account for the City of Elizabethton, denied that he had ever heard of a "ghost phone," and stated that he did not know the meaning of that term. (*Id*., Love, TR 80, 83.) Lane testified that petitioner managed the cellular account for the Elizabethton Power Board. (*Id*., Lane, TR 116.) Lane was familiar with the term "ghost phone," which she defined as an extra cellular phone on an account that could not be identified to a user. (*Id.*) The Elizabethton Power Board had a ghost phone on its account that had been discovered several months earlier by AT&T's corporate account team in Richmond, Virginia. (*Id.* at 117.) Lane was notified of the problem and discovered that a telephone on that account had been given to a person who, when called, identified herself as [1]There is no evidence in the record as to the price petitioner charged for the 1994 sale of the cocaine. "Sam." (*Id*. at 118.) Petitioner was the only person who could activate a telephone on the Elizabethton account. (*Id*. at 120-21.)

Thereafter the United States rested its rebuttal case, defendant renewed his Rule 29 motion, and the Court denied the motion. (*Id*., TR 124-26.)

In his closing argument before the jury, counsel for petitioner stated near the beginning of his argument that "[u]sually I don't talk about the indictment much, but this time I'm going to. I firmly believe that Mr. Love was indicted because he was a black male with an Escalade and he had a $35 drug sale when he was eighteen years old."[1] (R. 612, Trial Transcript, TR 42.)

Petitioner filed a post-verdict motion for judgment of acquittal in which he asserted: (1) the evidence was insufficient to prove the conspiracy as charged and, at best, showed only that petitioner was in a buyer-seller relationship with Duarte; (2) there was no permissible connection between petitioner's 1994 prior drug conviction and the charge in this case; (3) Agent Templeton presented false testimony before the grand jury; (4) dismissal of the charge was necessary because the United States had failed to prove the alleged theory of its case – that petitioner lacked the "net worth" to purchase the cocaine in this case – because it was unaware of petitioner's other legitimate sources of income; and (5) the jury's verdict as to the drug amount attributable to co-defendant Davis was inconsistent with the verdict as to petitioner and showed that, at best, the evidence proved a mere buyer-seller relationship with Duarte. (R. 553, Motion for Judgment of Acquittal.) The Court rejected each of these arguments by Order entered April 11, 2005. (R. 666, Order.)

Petitioner also filed a post-verdict motion for new trial in which he argued that the Court erred: (1) by admitting evidence of petitioner's prior felony drug conviction pursuant to Rule 404(b); (2) by denying his motion for acquittal because, as petitioner explained in detail, the verdict was against the weight of the evidence; (3) by refusing to admit evidence that the jury had convicted co-defendant Gary Musick in a separate trial of conspiring to distribute less than 500 grams of cocaine, which was relevant as to Gorge Duarte's credibility in that Duarte provided testimony at Musick's trial similar to that provided against petitioner; (4) by prohibiting petitioner from cross-examining Raven Serna as to whether she was provided a "contact visit" with her husband in return for her testimony on behalf of the United States; (5) by denying a new trial on the ground that Agent Templeton presented untruthful testimony before the grand jury where he testified that Duarte's drug ledgers contained the name "Love" and also testified that petitioner's income selling cell phones could not support the purchase of a kilogram of cocaine, not knowing that petitioner had two other jobs; (6) by failing to dismiss the indictment based upon the United States's alleged violation of its responsibility under *Brady/Giglio* where it failed to provide petitioner with a letter written in Spanish by Gorge Duarte, which was provided to co-defendant Musick; (7) by not replying in the negative to questions from the jury during deliberations as to its determination of the drug amount attributable to petitioner as a member of the conspiracy; (8) by failing to set aside the jury's verdict as to petitioner as improperly inconsistent with the verdict as to co-defendant Davis, which must have been based upon a finding of no

more than a "buyer-seller" relationship; and (9) by overruling petitioner's objection to the rebuttal testimony of Sherron Lane regarding petitioner's performance as a cell phone representative, which was irrelevant and unfairly prejudicial. (R. 552, Motion for New Trial.)

[Doc. 834, pp. 2-20]

## II.  Standard of Review

This Court must vacate and set aside petitioner's  sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ."  28 U.S.C. § 2255.   Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief.  If it plainly appears the movant is not entitled to relief,  the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th Cir. 1961).  "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing."  *O'Malley*, 285 F.2d at 735 (citations omitted).  A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the

proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland* 466 U.S. at 687. As with any other claim under § 2255, the burden of proving ineffective assistance of counsel is on the petitioner. *Virgin Islands v. Nicholas*, 759 F. 2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The *Strickland* Court emphasized that both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both

components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Id.* at 697.


### III. <u>Analysis and Discussion</u>

Petitioner raises five broad grounds for relief in this motion. He states those grounds as:

| | |
|---|---|
| GROUND ONE: | INEFFECTIVE ASSISTANCE-FAILURE TO SEEK SEVERANCE, INVESTIGATE POTENTIAL WITNESSES, AND PRESENT EXPERT TESTIMONY |
| GROUND TWO: AMENDMENT CROSS-SECTION THE JURY | VIOLATION OF THE SIXTH GUARANTEE OF A FAIR OF THE COMMUNITY IN SELECTION PROCESS |
| GROUND THREE: AMENDMENT BY AN | VIOLATION OF THE SIXTH GUARANTEE TO BE TRIED IMPARTIAL JURY |
| GROUND FOUR: | INEFFECTIVE ASSISTANCE OF COUNSEL -FAILURE TO OBJECT TO PROSECUTORIAL MISCONDUCT |
| GROUND FIVE: | PROSECUTORIAL MISCONDUCT |

[Doc. 822, pp. 27, 52, 59, 63, 65]


#### A. **Composition of the Jury (Ground Two)**

Love claims that his Sixth Amendment right to a petit jury selected at random from a fair cross-section of the community was violated in this case. He specifically claims that "the jury pool from which the petit jury in the case at bar was selected consistent entirely of Caucasian

individuals." Love acknowledges that this fact alone[4] is insufficient to warrant relief but relies on the affidavits of "seven other individuals who were likewise tried in front of a jury void of African-Americans or other individuals of minority ethnic descent" to establish, as he sees it, that this Court's jury selection process "systematically excludes minorities from serving as jurors in criminal cases."[5] Petitioner, citing United States Census Bureau statistics that show that "white persons" comprise 99.6% of the population in Greene County, Tennessee, [6] argues that "4%" of non-Caucasians are being excluded from the jury pool.

This claim fails for several reasons. First, it is barred by statute. The Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. § 1861, *et seq.*, provides the exclusive means of challenging the venire in a criminal case. The relevant parts of the JSSA provide:

> (a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefore, whichever is earlier, the defendant may move to dismiss the

---

[4] Although nothing in the record establishes that the "pool" was all white, the Court will accept that as established for the purposes of the instant motion.

[5] The seven affidavits are signed by co-defendant Delman Davis, who was tried with Love, Rudy Garnier, Mario Graves, Terry Woods, Charles Jackson, co-defendant Gary Musick, who was tried separately from Love, Garland Slade and David Hill. Each of the affidavits, except for the name and case information of the affiant, is identical. In relevant part, they read as follows:

> 2. Trial in my case was held in the United States District Court for the Eastern District of Tennessee at Greeneville.

> 3. There were no African-American members of the jury in my case, and to the best of my recollection, there were no African-American members of the jury pool from which they were selected.

[Docs. 822-73, 74, 75, 76, 77, 78, 79, 80]

[6] While the situs of the federal courthouse in the Northeastern Division of this Court is in Greene County, Tennessee, the pool of potential jurors is drawn from the ten Northeast Tennessee counties which comprise the Northeastern Division.

> indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.
>
> . . .
>
> (e) The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title.

28 U.S.C. § 1867(a) and (e).  *See United States v. Ovalle*, 136 F.3d 1092, 1098 (6th Cir. 1998) (holding that failure to comply precisely with the requirements of § 1867 bars such a challenge); *United States v. Johnson*, 40 Fed. App'x 93 (6th Cir. June 27, 2002).  Here, Love raises his claim for the first time in this § 2255 proceeding and it is clearly barred by the statute.[7]

Second, even if not statutorily barred, the claim is procedurally defaulted because Love failed to raise it at trial or on appeal.  "A procedurally defaulted claim, absent a showing of cause and prejudice or actual innocence, cannot give rise to relief under § 2255." *Peveler v. United States*, 269 F.3d 693, 698 (6th Cir. 2001).   Love has alleged neither cause nor prejudice excusing his default in his motion and the only conceivable claim for cause would be a claim of ineffective assistance of counsel.  "Attorney error may constitute cause if it rises to the level of constitutionally ineffective assistance of counsel." *Barrow v. United States*, 8 Fed. App'x 286, 288 (6th Cir. 2001) (citing *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994)).   Yet, Love makes no claim of ineffective assistance of counsel.

---

[7] In his answer to the government's response, Love asserts that his claim is not barred by the JSSA because he raised the issue at sentencing and complied with the statute.  Clearly he did not raise the issue prior to the voir dire examination nor did he raise it within seven days after it was discovered or could have been discovered.  He clearly was aware of the composition of the jury venire and the jury selected to try his case at the time of jury selection.

Even if he did make such a claim, it fails because petitioner does not state a claim that his attorney rendered deficient performance in this regard. The Sixth Amendment requires that the jury venire from which a jury is selected represent a "fair cross-section" of the community. *Taylor v. Louisiana*, 419 U.S. 522 (1975). In order to make a *prima facie* showing of a violation of the Sixth Amendment, a defendant must establish that: (1) The group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357 (1979); *United States v. Buchanan*, 213 F.3d 302, 308 (6th Cir. 2000).

The Sixth Circuit Court of Appeals has had occasion previously to examine the jury selection procedure in this district under the above standards. In *United States v. Clark*, 112 Fed. App'x 481, 2004 WL 2299452 (6th Cir. (Tenn.)), vacated on other grounds, 545 U.S. 1101 (2005), a case originating in the Northern Division of this district, the defendant, on direct appeal, made the same challenge that petitioner Love now makes. Finding no evidence that under-representation of blacks in Clark's jury venire resulted from "systematic exclusion," the Sixth Circuit held that Clark could not "establish a *prima facie* violation of his right to a jury panel composed of a fair cross-section of his peers." *Id.* at 486. While *Clark* involved a direct appeal, the Sixth Circuit has also ruled on the issue raised in the context of a § 2255 motion, a situation more clearly analogous to the instant one. In *Holmes v. United States*, 281 Fed. App'x 475, 2008 WL 2467978 (6th Cir. (Tenn.)), another case originating in the Knoxville Division of this Court, the petitioner made a claim of ineffective assistance of counsel for failing to object to the venire panel. In view of the *Clark* decision, the

Sixth Circuit held that "counsel's failure to raise a challenge to the jury venire was not deficient so as to constitute ineffective assistance of counsel . . . [e]ven though *Clark* was issued after Holmes' trial . . ." *Id.* at 480. The same is true here.

In addition, to the extent petitioner relies on *Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2009), that reliance is misplaced.[8] In *Smith*, the Sixth Circuit Court of Appeals dealt with the State of Michigan's jury selection process, not that of the United States District Court for the Eastern District of Tennessee. Secondly, the Sixth Circuit was reversed by a unanimous Supreme Court in *Berghuis v. Smith*, 130 S. Ct. 1382 (2010). Nothing in the Supreme Court's opinion lends any support to petitioner's claim.

### B.    Impartial Jury (Ground Three)

One of the jurors seating on the jury which tried Love's case was James M. Wilder. On the juror questionnaire submitted by this juror, questions related to whether the prospective juror had relatives associated with law enforcement or relatives who were involved in a criminal case as either a defendant or victim were answered in the negative. During voir dire, perspective jurors were asked if any juror had "been involved as either a defendant or a victim in a criminal case?", and whether they had "had any personal tragedies dealing with drugs, friends, family that because of drugs ruined their lives?" Although some jurors responded in the affirmative, this juror did not. Love now claims that this juror was untruthful and withheld information from the Court.

Love contends, more specifically, that Wilder failed to disclose that three of his relatives,

---

[8] The Court addresses this issue out of an abundance of caution. Although a claim based on *Smith v. Berghuis* has not been explicitly raised by petitioner, he did previously ask the Court to hold action on his § 2255 petition in abeyance pending the Supreme Court's decision. As noted above, the Supreme Court reversed the Sixth Circuit's holding in *Smith* that the under-representation of African-Americans on county venire panels in Michigan State courts was a result of systematic exclusion.

in the span of three months in 2003, had met untimely deaths which were drug related, one of them the murder of an individual who worked as a paid informant for the local drug task force. In support of his claim, Love has attached to his memorandum several news reports: (1) a September 9, 2003 report from the website of WATE-TV (Knoxville); (2) an undated article from the Morristown newspaper; and (3) an undated obituary announcement from the same newspaper concerning the death of Donald Wilder, Sr. on November 1, 2003. In short, the news reports relate to the disappearance of Don Wilder, a drug informant, and the death of his wife, Melissa, from a drug overdose. The Wilders were identified as "key witnesses" in approximately 30 drug cases then being prosecuted in Hamblen County, Tennessee, Criminal Court. Don Wilder was later confirmed to have been the victim of an "assassination-style contract killing." The relationship of Donald Wilder, Sr. to either Don or Melissa Wilder is not apparent from Love's filings.

This claim fails for an obvious reason. Except for the conclusory allegation that Don and Melissa Wilder and Donald Wilder, Sr. were relatives of the subject juror, there is no factual allegation to support the claim. There is nothing in Love's filings to show any relationship between juror James Wilder and any of these individuals or to suggest that the juror misrepresented or withheld any information. In his reply, Love "does not dispute this fact," claims he has hired an investigative firm which has not yet completed its investigation, and avows that he will provide a copy of the report to the Court or withdraw the claim as soon as he receives the report. Although the reply was filed more than two years ago, the petitioner has been forthcoming with neither. This claim was not made in good faith, is not supported by any factual basis, and is utterly without merit.

As the government argues, there is an additional reason why this claim fails–petitioner can demonstrate no prejudice. Petitioner does not assert that any information allegedly at issue here

24

would have led to this juror's having been excluded for cause in this case. At best, Love claims that the information would have allowed him to more intelligently exercise his peremptory challenges. But such a claim fails because "[t]here is nothing in the Constitution of the United States which requires Congress to grant peremptory challenges." *Zerka v. Greene*, 49 F.3d 1181, 1186-87 (6th Cir. 1995). In order to obtain a new trial on such a claim, the petitioner must show, first, "*that a juror failed to answer honestly* a material question on *voir dire*," which petitioner here cannot do, and, secondly, "*that a correct response would have provided a valid basis for a challenge for cause.*" *Id.* at 1185 (quoting *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984)) (emphasis in original).

Petitioner doesn't come close with this claim of meeting either requirement of the *McDonough* test and the claim clearly fails.

## C. Prosecutorial Misconduct (Claims 4 and 5)

Love next claims prosecutorial misconduct related to his prosecution and trial and counsel's ineffectiveness for not objecting to the alleged misconduct. More specifically, he makes three distinct allegations of misconduct by the government prosecutor: (1) that his prosecution was "vindictive [9] and selective;" (2) that the prosecutor knowingly presented perjured testimony in order to obtain an indictment and; and (3) fraud on the court to obtain admission of evidence of prior bad

---

[9] Although the petitioner alleges here in conclusory fashion that the prosecution was "vindictive," he makes no effort to develop any argument that it was so. Vindictive prosecution and selective prosecution claims are distinct and separate claims. *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991). A *prima facie* case of vindictive prosecution requires allegations of "(1) exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; (4) the intent to punish the defendant for the exercise of the protected right." *United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001). The Sixth Circuit has held that "a decision to prosecute may not be deliberately based upon the exercise of protected statutory rights." *United States v. Adams*, 870 F.2d 1140, 1145 (6th Cir. 1989). Since petitioner alleges no facts which could even arguably give rise to a vindictive prosecution claim under this standard, the Court does not further address this issue.

acts at trial. The Court will address each of these allegations in turn.

### 1. Selective Prosecution

The crux of Love's claim here is that the government had information that individuals involved in the charged conspiracy were "importing large amounts of cocaine into the United States" and that the son of a "respected city official" was purchasing cocaine from a government witness but "elected to pursue information related only to the African-American individuals." Although he acknowledges, as he must, that two Caucasians, Gary and Lita Musick, were charged in this same indictment, Love argues that they were indicted only because "their arrest was crucial to the conviction of others within the conspiracy," an allegation he never explains.[10] He claims that it "would have been easier for the government to prosecute some of the other alleged conspirators" listed in drug ledgers seized from Duarte and Serna. Love further relies on unspecified "statistical data" to provide a *prima facie* showing of discriminatory intent.

The government labels this claim "frivolous" and argues that petitioner can show "no evidence that the United States chose not to prosecute any similarly-situated drug dealers in the conspiracy who, like petitioner, were trafficking in kilogram-quantities of cocaine." The government asserts that "[p]etitioner has not demonstrated either a discriminatory purpose or effect in the charging decisions in this case and his argument is factually and legally without support."

The Court is constrained to agree with the government. The Court applies "ordinary equal protection standards" to claims of selective prosecution. *Cornwell v. Bradshaw*, 559 F.3d 398, 411 (6th Cir. 2009) (citing *Wayte v. United States*, 470 U.S. 598 (1985)). In order to prevail on a

---

[10]   Love ignores the fact that three Hispanic individuals were also indicted in this case. In other words, three Hispanics, two Caucasians and four African-Americans were indicted in this case.

selective prosecution claim, a defendant must show that the federal prosecutorial policy had both a discriminatory intent and a discriminatory effect. *United States v. Jones*, 159 F.3d 969, 976 (6th Cir. 1998) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). To establish discriminatory intent in a case alleging selective prosecution based on race, a claimant must show that the prosecutorial policy was motivated by racial animus. *Id.* at 977. To establish discriminatory effect, the claimant must demonstrate that similarly situated individuals of a different race were not similarly prosecuted. *Id.*

Love has not attempted to plead factual allegations that similarly situated individuals of a different race were not prosecuted. Although he claims, in conclusory fashion, that African-Americans were somehow targeted for prosecution, he does not identify by name or any other identifying feature the persons of a different race he claims were "similarly situated." While he does attach to his memorandum three pages, showing first names, from the drug ledgers seized, he does not state their race or make any attempt to show how they were similarly situated except that they were "importing large amounts of cocaine." The one example he does give, that is, the son of a local police chief who was purchasing cocaine from a government witness, illustrates the government's point quite well. It cannot be reasonably suggested that a person who purchases cocaine is similarly situated to someone who was trafficking in multi-kilogram quantities of cocaine.

There is yet another reason why petitioner's claim fails. He raises it for the first time in this proceeding and it has been waived. Federal Rule of Criminal Procedure 12(b)(3) requires a defendant to raise an objection "alleging a defect in instituting the prosecution" prior to trial. A selective prosecution claim clearly qualifies as such an objection. *United States v. Mann*, 884 F.2d 532, 539 (10th Cir. 1989) (selective prosecution implicates institution of prosecution and must be

raised prior to trial). Failure to file a timely motion under Rule 12(b)(3) constitutes a waiver of the objection, but the court may grant relief from the waiver "for good cause." Fed. R. Crim. P. 12(e). Petitioner makes no attempt to show good cause and none is apparent to the Court. These drug ledgers were made available to petitioner as part of the discovery long before trial and nothing prevented petitioner's raising this claim prior to trial.

### 2. Perjured Testimony

Petitioner's second claim of prosecutorial misconduct is that the government prosecutor "knowingly and willingly suborned perjury" before the grand jury and at trial. With respect to the grand jury testimony, Love claims that DEA Agent Templeton gave "patently false" testimony that he had drug ledgers that contained the name "Love" beside Love's personal telephone number and descriptions of drug transactions. With respect to trial testimony, Love claims that the testimony of Gorge Duarte was "replete with obvious falsehoods." He cites Duarte's testimony that he could not read or write as contradicted by his testimony that he wrote everything in the drug ledgers. He also references the testimony of Eric Serna that he ceased his drug related activities in June of 2003 as contradicted by his testimony that he traded cocaine for two automobiles owned by Love after that date. Love claims the government attorney knew the testimony to be false at the time it was given.

The government responds that it agrees, and did at trial, that Agent Templeton misstated unintentionally the evidence before the grand jury, that defendant's attorney used the misstatement at trial to impeach the testimony of Templeton, and that the Court considered and rejected the same claim in overruling petitioner's motion for judgment of acquittal and for new trial. Further, the government argues that petitioner, through cross-examination, impeached Duarte and

Serna on these issues and their credibility was simply a matter for the jury to resolve.

This claim also fails for numerous reasons. First of all, Federal Rules of Criminal Procedure 12(b)(3)(A) and (B) and 12(c) require a party to raise any alleged defect in instituting the prosecution or alleging a defect in the indictment by the grand jury to be raised before trial or it is waived unless good cause is shown. In addition, any claims that petitioner could have raised on direct appeal, but did not, are deemed waived for purposes of a § 2255 motion. *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner has not shown cause for his failure to raise the issue of allegedly perjured testimony on direct appeal. He and counsel were clearly aware of the allegations, having raised them in the trial court.

Even if Love could establish ineffective assistance of counsel as cause for his default, he cannot show prejudice. As for the grand jury proceedings, any misstatement by Templeton in his testimony can hardly be claimed to be material given that he acknowledged the misstatement at trial and defendant's counsel used the misstatement to attempt to impeach Templeton. Any "prejudice" to petitioner was cured when the jury, applying a beyond a reasonable doubt standard (while the grand jury was only determining probable cause) found the testimony of Templeton to be credible and found Love guilty. As to the testimony of Duarte and Serna, the trial record shows that they were vigorously cross-examined by Love's attorney, that they were impeached through the use of their allegedly inconsistent statements, and that the jury, as was its province, resolved their credibility in favor of the government.

Secondly, even if considered on the merits, the claim of petitioner that the government knowingly offered false testimony fails. The law is well settled that to vacate a sentence on the grounds of perjured testimony, the petitioner must not only prove that he was convicted by

perjured testimony but also that the false statements were material and that the prosecuting officials at the time the testimony was used knew that it was perjured. *See, e.g., United States v. Bagley*, 473 U.S. 667, 679-80 (1985); *United States v. Farley*, 2F.3d 645, 655 (6th Cir. 1993). In order to state a claim for subornation of perjury, it must be shown that the testimony referred to was false, that it was material, and that the prosecutor knew it was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id.* (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). With respect to the testimony of Templeton, petitioner offers no facts to establish that the testimony was anything other than an unintentional misstatement as Templeton testified at trial. With respect to Duarte and Serna, Love has done nothing more than identify inconsistencies in their testimony and has not demonstrated that the testimony was false. Even if he could show that the testimony was false, he has not offered a scintilla of evidence beyond the fact of the inconsistent statements themselves that the government knowingly offered false testimony. A habeas petitioner must show that a witness's statement was indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).

3. Fraud Upon The Court

Petitioner's final allegation of prosecutorial misconduct is difficult to discern. He argues that the government "provided a fabricated story" in order to permit the government to introduce evidence of petitioner's prior conviction.

Over petitioner's objection, the Court admitted evidence, pursuant to Federal Rule of Evidence 404(b), of Love's eight year old Tennessee state court conviction for selling at least .5 grams of cocaine. Love appealed and the Sixth Circuit affirmed, holding that proof of the prior

conviction was admissible to prove Love's specific intent to participate in the charged drug conspiracy. *United States v. Love*, 254 Fed. App'x 511 at **3 (6th Cir. 2007).

Petitioner's allegation of ineffective assistance of counsel for failure to object to a fraud on the court is nothing more than a thinly disguised effort to relitigate the admissibility of the prior conviction. Love may not use a § 2255 motion to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law. *DuPonte v. United States*, 76 F.3d 108, 110-11 (6th Cir. 1996). There are no highly exceptional circumstances here. This claim lacks merit.

## IV.    Conclusion

For the reasons set forth above, petitioner's claims Two, Three, Four and Five lack merit and his petition will be DISMISSED as to those claims. The Court will enter final judgment in this matter after the evidentiary hearing scheduled and the Court's resolution of the claims which are the subject of that hearing. The Court will also defer any determination of whether a certificate of appealibility should issue as to any claim until the remaining claims are resolved.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE